

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], | : 17CV3235 <br> : JUDGE CASTILLO <br> : No MAG. JUDGE SCHENKIER <br> : |
| Plaintiff-Relator, | : <br> : JURY TRIAL DEMANDED |
| v. | : <br> : **FILED IN CAMERA AND** |
| [UNDER SEAL], | : **UNDER SEAL (Pursuant to** <br> : **31 U.S.C. §§ 3729,** *et seq.***)** |
| Defendants. | : <br> : **DO NOT POST ON PACER** <br> : **DO NOT PLACE IN PRESS** <br> : **BOX** <br> : |

## COMPLAINT

### FILED IN CAMERA AND UNDER SEAL

### Pursuant to 31 U.S.C. § 3730(b)(2)

FILED

APR 28 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

8001.050

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DR. MICHELLE DEES, | : : : No. _____ |
| Plaintiff-Relator, | : : : JURY TRIAL DEMANDED |
| v. | : : |
| LEGACY HEALTHCARE FINANCIAL SERVICES, LLC AND LEGACY HEALTHCARE NETWORK, LLC D/B/A LEGACY HEALTHCARE; AND SOUTH LOOP SKILLED NURSING FACILITY, LLC, D/B/A WARREN BARR SOUTH LOOP, | : **FILED IN CAMERA AND** : **UNDER SEAL (Pursuant to** : **31 U.S.C. §§ 3729,** *et seq.*) : : **DO NOT POST ON PACER** : **DO NOT PLACE IN PRESS** : **BOX** : |
| Defendants. | : |

## COMPLAINT

Plaintiff-Relator, Dr. Michelle Dees ("Dr. Dees" or "Relator"), by and through her undersigned counsel, brings this action against Defendants Legacy Healthcare Financial Services, LLC, Legacy Healthcare Network, LLC, d/b/a Legacy Healthcare and South Loop Skilled Nursing Facility, LLC, d/b/a Warren Barr South Loop (collectively, "Legacy"), alleging as follows:

## I.       NATURE OF THE CASE

1.       This is an action brought by Dr. Dees under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended (the "False Claims Act"), to recover damages and civil penalties from Legacy on behalf of the United States of America (the "U.S."), and under the Illinois False Claims Act, 740 ILCS 175/1, *et seq.* (the "IFCA"), to recover damages and civil penalties from Legacy on behalf of the State of Illinois (the "State").

2.     Legacy is a privately owned "post-acute care network," providing medical services at Skilled Nursing Facilities ("SNFs"). The State and Federal Governments, through Medicare, Medicaid, and other health insurance programs, reimburse SNFs for providing services to qualified patients.

3.     Legacy has been engaged in a fraudulent scheme against the United States and Illinois in violation of the False Claims Act and the IFCA, whereby Legacy seeks payment from government health insurers for higher patient daily reimbursement rates than are justified by those patients' actual conditions or needs – a practice commonly referred to as "upcoding." Legacy's upcoding schemes have caused government health insurers to overpay Legacy.

4.     A large percentage of the patients in Legacy's facilities are eligible for Medicare and Medicaid. Under its prospective payment system ("PPS"), Medicare reimburses Legacy a pre-determined daily rate for each day of skilled nursing services Legacy provides to a patient. *See* U.S. Dep't of Health & Human Services, Centers for Medicare & Medicaid Services, Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual, p. 6-1 (October 2015) (hereinafter, "CMS RAI 3.0 Manual"). The daily PPS rate is based upon the Resource Utilization Group ("RUG") to which each person is assigned. *Id*. at 6-1, 6-2. The fees associated with each RUG classification vary depending upon the anticipated costs associated with providing nursing and rehabilitation services to patients with similar medical or resource needs, including whether or not the patient is depressed. *Id*. Other medical payors, including the Illinois Medicaid program, base their reimbursement rates on the same RUG classification system. See *Id*. at 6-2.

5.      The particular RUG and RUG category that a patient falls into is determined by patient data measured by the Minimum Data Set ("MDS") assessment. *Id.* at 6-1, 6-2. The MDS assessment is a federally-mandated assessment of SNF patients that is taken at certain specified intervals to provide a comprehensive assessment of each patient's medical and resource needs.

6.      In order to properly identify and treat patients who may be dealing with depression, SNFs administer the Patient Health Questionnaire Module 9 ("PHQ-9") assessment. The Patient Health Questionnaire is a self-administered version of the PRIME-MD diagnostic instrument for common mental disorders. The PHQ-9 assessment is the depression screening module, which scores each of the 9 criteria contained in the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association, as "0" (not at all) to "3" (nearly every day). A patient's PHQ-9 score has a tremendous impact not only on the patient's RUG, but also on the Medicare reimbursement daily rate.

7.      In the fall of 2015, after working for some time at Warren Barr South Loop, Dr. Dees discovered that the PHQ-9 scores of the patients she was attending were too high. In some instances, PHQ-9 scores had been suddenly raised, even though the patients' psychiatric conditions had not changed. In other cases, patients' PHQ-9 scores denoted moderate or severe levels of depression for patients who were not actually moderately or severely depressed. Dr. Dees noted these discrepancies to Warren Barr South Loop nurses and social workers and told them that the PHQ-9 scores needed to be changed. Dr. Dees made notes on some of her patients' charts, indicating that their PHQ-9 scores did not correspond with her psychiatric diagnoses of those patients and needed to be corrected.

Despite being told on multiple occasions by Legacy that the patients' PHQ-9 scores would not be changed, Dr. Dees continued to raise the issue until she eventually resigned on April 30, 2016.

8.     While working at Legacy, Dr. Dees observed that Legacy was upcoding the PHQ-9 scores of its patients.  Upcoding PHQ-9 scores results in patients being classified as moderately or severely depressed without regard to their actual psychiatric needs, and when observation and assessment did not indicate a diagnosis of moderate or severe depression.  Legacy encourages and enables its social workers to upcode their patients' PHQ-9 scores of its patients for the purpose of receiving higher daily reimbursement rates from the government for those patients.  Specifically, the social workers would record the upcoded scores in the patients' charts by accessing Legacy's electronic medical records system with a login ID and password and then e-signing the form.  The electronic chart entry would retain the login ID of the person who inputted the score.  Legacy then knowingly and intentionally submits the upcoded and inflated invoices for payment by Medicare, Medicaid, and other payors.

9.     Dr. Dees brings this action to stop Legacy's schemes and to recover damages and civil penalties on behalf of the United States and the State of Illinois, as a qui tam relator pursuant to the False Claims Act and IFCA.

10.     The False Claims Act and IFCA prohibit knowingly presenting (or causing to be presented) to the State or Federal Government a false or fraudulent claim for payment or approval.  The False Claims Act and the IFCA also prohibit knowingly making or using a false or fraudulent record or statement to get a false or fraudulent claim paid or approved by the State or Federal Government.

11.     Any person who violates the federal False Claims Act or the IFCA is liable for civil penalties of up to $11,000 for each violation, plus three times the amount of the damages sustained by the State or Federal Government.

12.     The False Claims Act and the IFCA allow any person having information about false or fraudulent claims to bring an action on behalf of the State and Federal Government, and to share in any recovery.

13.     All of the allegations in this Complaint are based on evidence obtained directly by Dr. Dees independently and through her own labor and efforts.  The information and evidence that Dr. Dees has obtained or of which she has personal knowledge, and on which these allegations of False Claims Act and IFCA violations are based, consist of her personal experiences while working for Legacy, documents, computer data, and conversations with authorized agents and employees of Legacy.  Dr. Dees has provided that information to the State and Federal Government in advance of filing this action and is, therefore, an original source of the information alleged herein.

14.     Pursuant to 31 U.S.C. § 3730(b)(2) and 740 ILCS 175/4(b)(2), Dr. Dees is providing the State and Federal Government with a copy of this Complaint and a written disclosure of substantially all material evidence and material information in her possession.

15.     In accordance with 31 U.S.C. § 3730(b)(2) and 740 ILCS 175/4(b)(2), the Complaint has been filed *in camera* and will remain under seal for a period of at least sixty (60) days and shall not be served on Legacy until the Court so orders.

II.      **PARTIES**

16.      Dr. Dees is a psychiatrist who worked at a Legacy-operated SNF from 2011 until April 30, 2016.  Dr. Dees has direct and independent knowledge of the false claims alleged in this Complaint, and brings this action for violation of the False Claims Act and the IFCA on behalf of herself and the State and Federal Government.

17.      Legacy is a privately owned "post-acute care network," providing medical services at SNFs.  "Legacy Healthcare" is a registered Illinois assumed name for Legacy Healthcare Financial Services, LLC.  Legacy Healthcare Financial Services, LLC was formed in Illinois in 2008.  Chaim Rajchenbach, Menachem Shabat, and Legacy Healthcare Network, LLC are the managers of Legacy Healthcare Financial Services, LLC. Legacy Healthcare Network, LLC was formed in Illinois in 2016.  Legacy Healthcare Network, LLC, is managed by Yair Zuckerman.  Both Legacy Healthcare Financial Services, LLC and Legacy Healthcare Network, LLC are Illinois LLCs.  Legacy's corporate offices are located at 3450 Oakton Street, Skokie, Illinois 60076.

18.      Legacy provides these services through at least twenty-seven (27) SNFs.  (*See* Cascade Capital Group, LLC's news release, dated September 13, 2016, attached hereto as Exhibit A, referring to Legacy operating "27 Cascade facilities in 3 states.") Twenty-two (22) of Legacy's SNF's are located in Chicago and its surrounding suburbs.  Two (2) are located in Utah and one (1) is located in Colorado.   Four (4) of the SNFs operated by Legacy are Warren Barr Gold Coast, Warren Barr Lincolnshire, Warren Barr North Shore, and Warren Barr South Loop.  In addition, Legacy operates the following SNFs:

1)      Avantara Crown Point: Crown Point, CO
2)      Avantara Long Grove: Long Grove, IL

3)      Avantara Park Ridge: Park Ridge, IL
4)      The Grove Fox Valley: Aurora, IL
5)      The Grove Lincoln Park: Chicago, IL
6)      The Grove La Grange Park: La Grange Park, IL
7)      The Grove at the Lake: Zion, IL
8)      The Grove Evanston: Evanston, IL
9)      The Grove Northbrook: Northbrook, IL
10)     The Grove Skokie: Skokie, IL
11)     The Vistas Fox Valley: Aurora, IL
12)     Bella Terra Morton Grove: Morton Grove, IL
13)     Bella Terra Cedar City: Cedar City, UT
14)     Bella Terra St. George: St. George, UT
15)     The Wellshire Lincolnshire: Lincolnshire, IL
16)     The Wellshire Morton Grove: Morton Grove, IL
17)     Astoria Place: Chicago, IL
18)     Chalet: Chicago, IL
19)     Elm Brook: Elmhurst, IL
20)     Peterson Park: Chicago, IL
21)     The Carlton: Chicago, IL

19.     Legacy's SNFs are managed and organized in the same way as Legacy Healthcare Financial Services, LLC and Legacy Healthcare Network, LLC.  With the possible exception of three SNFs, all of the SNFs do business as one or multiple LLCs, each of which is managed by some combination of Legacy Healthcare Network, LLC, Mechachem Shabat, Chaim Rajchenbach, and/or Yair Zuckerman.  Attached hereto as Exhibit B is a detailed spreadsheet that contains information regarding Legacy's and the other SNF's corporate structure.

20.     This complaint is not based upon a public disclosure as set forth in 31 U.S.C. §3730(e) or 740 ILCS 175/4.  Dr. Dees brings this action as the original source of information regarding Defendants' violations of the False Claims Act and IFCA, given that she has direct and independent knowledge of the information on which the allegations contained herein are based and/or knowledge that is independent of and materially adds to any allegations and transactions that were publicly disclosed, and Dr. Dees has voluntarily

provided the information on which this action is based to the government before filing this action.

21.     The United States and Illinois are named herein as plaintiffs, as the real party in interest pursuant to the FCA, 31 U.S.C. §§ 3729 *et seq.,* and the IFCA, 740 ILCS 175/1, *et seq.*

### III.     JURISDICTION AND VENUE

22.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, in particular, the False Claims Act.  Further, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

23.     This Court has supplemental jurisdiction over the subject matter of the claims brought under state law pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for actions brought under state laws arising from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

24.     This Court has personal jurisdiction over Legacy pursuant to 31 U.S.C. § 3732(a) because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and because Legacy has sufficient minimum contacts with the United States of America, and Legacy can be found in and transacts the business that is the subject of this lawsuit in the Northern District of Illinois.

25.     Venue is proper in this District and Division pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because Legacy can be found in and transacts business in this District.

### IV.     BACKGROUND FACTS

#### A.     Medicare Coverage for SNFs

26.     Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.  In order to qualify for inpatient, skilled nursing care under Medicare Part A, the following conditions must be met: (1) the patient must require skilled nursing care or skilled rehabilitation services on a daily basis; (2) the daily skilled services must be services that can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay).  42 CFR § 409.31.  Further, the service must qualify as a skilled service, meaning that it must be "so inherently complex that it can be safely and effective performed only by, or under the supervision or, profession or technical personnel."  42 CFR § 409.32(a).

27.     Subject to these conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care following a qualifying hospital stay of at least three consecutive days.  Many patients in SNFs fall under these conditions and, therefore, qualify for Medicare Part A.  Indeed, and as discussed below, when Legacy purchased Warren Barr South Loop, formerly St. Agnes, Dr. Dees observed that the social workers had been

instructed to "shift out" the long-term and/or Medicaid patients. Apparently, this was part of a strategy by Legacy to open up beds at Warren Barr South Loop to make room for more short-term patients who qualified for Medicare Part A.

**B.    Medicare Prospective Payment System for SNFs**

28.    The Balanced Budget Act of 1997 included the implementation of a Medicare PPS for SNFs. CMS RAI 3.0 Manual, p. 6-1. Under its PPS, Medicare pays a SNF like Legacy a pre-determined daily rate for each day of skilled nursing services it provides to a patient. The daily PPS rate depends in large part on the RUG to which a patient is assigned. *Id.* at 6-1, 6-2. Geographic location of the SNF and time period for the reimbursement are also taken into account. The reimbursement rate for each RUG differs based on the resource needs of the patients in that RUG, thus, patients with similar medical and resource needs are placed in the same RUG. *Id.*

29.    From October 1, 2010 to the present, Medicare has implemented the "Rug-IV" classification system, which contains 66 RUGs that are separated into eight major classification categories. *Id.* at 6-2. Those categories, listed from greatest to least resources used (and, therefore, from greatest to least reimbursement), are as follows:

- Rehabilitation Plus Extensive Services
- Rehabilitation
- Extensive Services
- Special Care High
- Special Care Low
- Clinically Complex
- Behavioral Symptoms and Cognitive Performance Problems
- Reduced Physical Function

*Id.* As stated, there are several RUGs within each category and a patient's RUG determines the reimbursement an SNF receives per day for that patient.

30.     The particular RUG and RUG category that a patient falls into is determined by patient data measured by MDS assessment. *Id.* at 6-1, 6-2. The MDS assessment is a federally-mandated assessment of SNF patients that is taken at certain specified intervals to provide a comprehensive assessment of each patient's medical and resource needs. In general, a SNF must assess each patient and complete the MDS assessment on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the SNF. *Id.* at 6-5. The MDS contains extensive information on the patient's nursing and therapy needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses.

31.     In order to properly identify and treat patients who may be dealing with depression, SNFs administer PHQ-9 assessments. *Id.* at D-1, D-2, D-3. The PHQ-9 assessment is either conducted by asking the patient questions or, if the patient is unable or unwilling to answer, the patient's caretakers will fill out the PHQ-9 based on their observations and time with the patient. For each question, the patient answers how frequently they have felt that particular symptom of depression in the last 2 weeks. *Id.* at D-2. If they have experienced that symptom 0-1 days over the last 2 weeks they receive a score of 0; 2-6 days receives a score of 1; 7-11 days receives a score of 2; and 12-14 days receives a score of three. *Id.* at D-5. After the patients' symptom frequency is recorded for each question, all of the frequency scores are added together for the patients' "Total Severity Score," which can be interpreted as follows:

- 1-4: Minimal Depression
- 5-9: Mild Depression
- 10-14: Moderate Depression
- 15-19: Moderately Severe Depression

- 20-27: Severe Depression

*Id.* at D-8, D-9. A copy of the PHQ-9 assessment is reproduced below.

| D0200. Resident Mood Interview (PHQ-9©) | | |
|---|---|---|
| Say to resident: *"Over the last 2 weeks, have you been bothered by any of the following problems?"* | | |
| If symptom is present, enter 1 (yes) in column 1, Symptom Presence.<br>If yes in column 1, then ask the resident: *"About how often have you been bothered by this?"*<br>Read and show the resident a card with the symptom frequency choices. Indicate response in column 2, Symptom Frequency. | | |

| 1. **Symptom Presence**<br>0. **No** (enter 0 in column 2)<br>1. **Yes** (enter 0-3 in column 2)<br>9. **No response** (leave column 2 blank) | 2. **Symptom Frequency**<br>0. **Never or 1 day**<br>1. **2-6 days** (several days)<br>2. **7-11 days** (half or more of the days)<br>3. **12-14 days** (nearly every day) | 1.<br>Symptom<br>Presence | 2.<br>Symptom<br>Frequency |
|---|---|---|---|
| | | ↓ Enter Scores in Boxes ↓ | |
| A. *Little interest or pleasure in doing things* | | ☐ | ☐ |
| B. *Feeling down, depressed, or hopeless* | | ☐ | ☐ |
| C. *Trouble falling or staying asleep, or sleeping too much* | | ☐ | ☐ |
| D. *Feeling tired or having little energy* | | ☐ | ☐ |
| E. *Poor appetite or overeating* | | ☐ | ☐ |
| F. *Feeling bad about yourself - or that you are a failure or have let yourself or your family down* | | ☐ | ☐ |
| G. *Trouble concentrating on things, such as reading the newspaper or watching television* | | ☐ | ☐ |
| H. *Moving or speaking so slowly that other people could have noticed. Or the opposite - being so fidgety or restless that you have been moving around a lot more than usual* | | ☐ | ☐ |
| I. *Thoughts that you would be better off dead, or of hurting yourself in some way* | | ☐ | ☐ |

32.     As noted above, a patient's RUG is determined based on various data from the MDS assessment. The PHQ-9 test, part of the MDS assessment, is a screening tool for depression to be used in conjunction with a clinical examination by a physician. An actual depression diagnosis must be established by applying the criteria in the Diagnostic and Statistical Manual of Mental Disorders, versions IV and 5, published by the American Psychiatric Association. However, for three RUG categories—Special Care High, Special Care Low, and Clinically Complex—the RUG a patient is placed in is determined in part based upon on whether or not the patient has a Total Severity Score greater than or equal to 10 on their PHQ-9 assessment. *Id.* at 6-39, 6-40, 6-41, 6-42, 6-43, 6-44, 6-45. Thus, two

patients with otherwise identical diagnoses, except for their PHQ-9 score, will have different RUGs and, therefore, different daily reimbursement rates if they fall in the Special Care High, Special Care Low, or Clinically Complex RUG categories.

33.     A patient's PHQ-9 score has a tremendous impact not only on the patient's RUG, but also on the Medicare reimbursement daily rate.  The following chart demonstrates that impact by summarizing the rates Medicare paid Warren Barr South Loop in 2015 and 2016 (the years that Dr. Dees observed PHQ-9 upcoding at Warren Barr South Loop) for patients in the Special Care High, Special Care Low, and Clinically Depressed RUG categories:[1]

| Rug Category | Activities of Daily Living Score | At Least Moderate Depression (PHQ-9 of at least 10) | RUG Submitted for Reimbursement | Per Patient Per Diem Rate in 2015 | Per Patient Per Diem Rate in 2016 |
|---|---|---|---|---|---|
| Special Care High | 15-16 | Yes | HE2 | $492.76 | $497.76 |
| Special Care High | 15-16 | No | HE1 | $409.18 | $413.32 |
| Special Care High | 11-14 | Yes | HD2 | $462.42 | $466.10 |
| Special Care High | 11-14 | No | HD1 | $384.80 | $388.69 |
| Special Care High | 6-10 | Yes | HC2 | $435.30 | $439.71 |
| Special Care High | 6-10 | No | HC1 | $363.89 | $367.58 |
| Special Care High | 2-5 | Yes | HB2 | $430.07 | $434.43 |
| Special Care High | 2-5 | No | HB1 | $360.41 | $364.06 |
| Special Care Low | 15-16 | Yes | LE2 | $447.49 | $452.02 |
| Special Care Low | 15-16 | No | LE1 | $374.34 | $378.13 |

---

[1] These reimbursement rates were calculated using the Home Health Prospective Payment System PC Pricer software programs.  *See* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PCPricer/HH.html.

| Rug Category | Activities of Daily Living Score | At Least Moderate Depression (PHQ-9 of at least 10) | RUG Submitted for Reimbursement | Per Patient Per Diem Rate in 2015 | Per Patient Per Diem Rate in 2016 |
|---|---|---|---|---|---|
| Special Care Low | 11-14 | Yes | LD2 | $430.07 | $434.43 |
| Special Care Low | 11-14 | No | LD1 | $360.41 | $364.06 |
| Special Care Low | 6-10 | Yes | LC2 | $377.83 | $381.66 |
| Special Care Low | 6-10 | No | LC1 | $318.61 | $321.85 |
| Special Care Low | 2-5 | Yes | LB2 | $358.67 | $362.30 |
| Special Care Low | 2-5 | No | LB1 | $304.69 | $307.77 |
| Clinically Complex | 15-16 | Yes | CE2 | $398.72 | $402.77 |
| Clinically Complex | 15-16 | No | CE1 | $367.38 | $371.11 |
| Clinically Complex | 11-14 | Yes | CD2 | $377.83 | $381.66 |
| Clinically Complex | 11-14 | No | CD1 | $346.48 | $349.99 |
| Clinically Complex | 6-10 | Yes | CC2 | $330.80 | $334.16 |
| Clinically Complex | 6-10 | No | CC1 | $306.42 | $309.54 |
| Clinically Complex | 2-5 | Yes | CB2 | $306.42 | $309.54 |
| Clinically Complex | 2-5 | No | CB1 | $283.79 | $238.66 |
| Clinically Complex | 0-1 | Yes | CA2 | $259.40 | $262.04 |
| Clinically Complex | 0-1 | No | CA1 | $241.98 | $244.44 |

34.     Thus, Legacy received as much as $90 more per day per patient at Warren Barr South Loop in 2015 and 2016 if that patient had a PHQ-9 score of at least 10. Indeed, every patient who fell into the Special Care High, Special Care Low, or Clinically Complex RUG categories was more lucrative for Legacy if they received a high PHQ-9 score than a patient with a PHQ-9 score less than 10.

35.     A patient's RUG determines the Medicare payment prospectively for a defined period of time, meaning that the SNF will receive that level of reimbursement from Medicare until the patient receives a new MDS assessment, which may or may not change the patient's RUG for the next prospective time period. *Id.* at 6-5. For the reimbursement itself, a patient's RUG information is incorporated into the Health Insurance Prospective Payment System code, which SNFs submit electronically to Medicare for payment. *Id.* at 6-6, 6-7, 6-8.

36.     As set forth below, Legacy encourages and enables its social workers to upcode patients' PHQ-9 scores, falsely instructing them that the PHQ-9 score is an "assessment of future risk," when in reality the PHQ-9 is a retrospective test that evaluates patients' depression symptom frequency over the past two weeks. Legacy then submits the upcoded claims to Medicare resulting in higher per patient daily reimbursement rates than Legacy is entitled to. PHQ-9 scores are upcoded, for profit, without regard to patients' actual psychiatric conditions. Legacy earns an inflated rate to the detriment of the patient who is stigmatized with a depression indication, which becomes part of their permanent medical record.

37.     Most state Medicaid programs also utilize Medicare's RUG classification system and the MDS assessment protocol. Illinois, for instance, uses the RUG-IV 48-group methodology for determining reimbursement rates for skilled nursing services. See      https://www.illinois.gov/hfs/sitecollectiondocuments/fy2015_annual_report_3-31-16_final.pdf.

C.    **The Relator, Dr. Michelle Dees**

38.    Dr. Dees was born and raised in Springfield, Illinois.  She graduated from Lake Land College with an Associate's Degree in Nursing in 1997, and graduated from the University of Illinois Springfield with a Bachelor's Degree in Nursing in 2000. Following her graduation from Saba University School of Medicine in June 2005, Dr. Dees completed a four-year residency program at Washington University School of Medicine in St. Louis.  Dr. Dees is board certified by the American Board of Psychology and Neurology.

39.    Since 2009, Dr. Dees has operated her own practice, MD Medical LLC, based in Chicago, Illinois. She serves patients in Chicago and the surrounding communities, both in hospitals and in nursing homes.  Dr. Dees began working as a psychiatrist at St. Agnes Nursing Home ("St. Agnes") in Chicago, Illinois, in 2011 when it was owned by Mado Healthcare Centers.  In September 2014, Legacy acquired St. Agnes and changed its name to Warren Barr South Loop.  Dr. Dees continued providing psychiatric services to her patients at Warren Barr South Loop under the new management, until she resigned on April 30, 2016.

V.    **LEGACY'S FRAUDULENT SCHEME**

40.    Legacy has engaged in a systematic effort to defraud the State and Federal Governments by falsely reporting the mental health of its patients in the SNFs it operates.  Depression screenings for elderly patients in SNFs are essential for providing high standards of care to a vulnerable patient population, especially elderly patients recovering from recent hospital stays.

41.     As set forth below, Legacy falsified its patients' medical records, as well as the bills it submitted to Medicare and Medicaid, by instructing its employees to assign inaccurate and inflated diagnostic and billing codes, or upcoding, for its patients' depression levels, resulting in increased reimbursements from government healthcare insurers.

A.     **Legacy's Upcoding Scheme**

42.     Legacy routinely encourages its social workers to record higher levels of depression in patients that only have mild depression or are not depressed at all.  Although the PHQ-9 test performed by these social workers is a short, straightforward 10-question test, Legacy instructed its social workers to score its patients at least a "10" on the PHQ-9 test, the lowest possible score for a patient to be classified as depressed for the purposes of determining their RUG group.  RUG groups are used by health care providers to categorize levels of service provided to particular patients.  By promulgating this scheme, Legacy was able to assign its patients to RUG groups classified for "depression" and thereby receive higher reimbursements from government healthcare insurers, than if these same patients had been appropriately assigned to the corresponding RUG group classified for "no depression."

(i)     **St. Agnes Nursing Home**

43.     Dr. Dees began working at St. Agnes Nursing Home in 2011, then owned by Mado Healthcare Centers, a private company operating intermediate and SNF facilities in Chicago.  At St. Agnes, Dr. Dees performed rounds with a psychiatric nurse, visiting patients with mental illnesses or who showed signs of mental illness.  Dr. Dees would ask the patient how they were feeling, how they were reacting to their medications,

and evaluate their treatment plan. She would then speak with the nurses on the patient's floor to see if they had observed behavioral or mood changes in the patients.

44.     After Dr. Dees and the psychiatric nurse conducted their in-person evaluations, Dr. Dees recorded her notes from the patient visits on the patients' charts, including ICD-9 codes[2] reflecting the patient's medical diagnosis, if applicable. For example, if Dr. Dees diagnosed a patient as depressed, she would record ICD-9 code 296.31 for mild depression, 296.33 for moderate depression, and 296.34 for severe depression on their charts.[3] The patient charts also contained a history of the patient's PHQ-9 tests and scores. Dr. Dees would regularly check the patient's most recent PHQ-9 score to ensure that it was consistent with Dr. Dees' medical diagnosis of the patient. Dr. Dees conducted these evaluations when a patient was first admitted to St. Agnes and thereafter on a quarterly basis.

### (ii)    Legacy Acquires Warren Barr South Loop

45.     In September 2014, Legacy acquired St. Agnes and renamed it Warren Barr South Loop. Although there was a large staff turnover after Legacy's acquisition, with much of the St. Agnes staff leaving voluntarily or being fired, Dr. Dees was retained. A few weeks after the transition to Legacy, Dr. Dees approached a Legacy Administrator, John Lindsey, and a Legacy corporate representative, "Harry," to discuss her future under the new management. Dr. Dees introduced herself to Mr. Lindsey and Harry, told them what her role had been at St. Agnes, and expressed her desire to continue working at Warren Barr South

---

[2] The ICD-9 (International Classification of Diseases, 9th edition) is a set of codes used by physicians, hospitals, and allied health workers to indicate diagnosis for all patient encounters.
[3] Beginning October 1, 2015, the ICD-10 went into effect and these codes were changed to F33.1 (mild), F33.2 (moderate), and F33.3 (severe). Dr. Dees used ICD-10 codes after October 1, 2015.

Loop. They thanked Dr. Dees for her work and told her that they also wanted her to continue working under the new management.

46.     During the same conversation, Mr. Lindsey and Harry described to Dr. Dees the changes they wanted to make to the nursing home.  While St. Agnes had been a long-term care facility where patients stayed until they died, Mr. Lindsey and Harry told Dr. Dees that they wanted to make Warren Barr South Loop an acute stay facility where patients stayed for only a short-term to rehabilitate and recover after hospital stays.  They also wanted to turn St. Agnes' double patient rooms into single patient rooms and convert the side of the building containing administrative offices into a physical therapy gym.

47.     In line with her conversation with Mr. Lindsey and Harry, Dr. Dees was told by social workers working at Warren Barr South Loop that they had been given lists of long-term and Medicaid patients that Legacy had determined needed to be transferred out of Warren Barr South Loop, which would now be focused on short-term, Medicare stays.  As Medicare Part A only covers the first 100 days of a patient's SNF stay, this was part of a scheme by Legacy to open up beds at Warren Barr South Loop to make room for more short-term patients who qualified for Medicare Part A.  Likewise, Legacy was able to remove patients who no longer received Medicare Part A benefits and, therefore, were not as profitable for Legacy.

48.     One of the social workers who complained frequently to Dr. Dees about having to transfer long-term and Medicaid patients to new facilities was Lee Luther. According to Mr. Luther, the St. Agnes patients and their families had previously understood that the patients would be able to stay at St. Agnes for the remainder of their life and, therefore, were upset when they were told by the social workers that they would need to be

transferred. One patient who was particularly upset was May Forte Smith. She and her family refused to consent to the transfer. Legacy relented and made an exception allowing Ms. Forte Smith to stay at Warren Barr South Loop, even though she was not a short-term patient recovering from a hospital visit.

### B. Dr. Dees Discovers PHQ-9 Score Upcoding

49. After Legacy's acquisition of St. Agnes, Dr. Dees conducted her patient evaluations in the same manner as she had prior to the acquisition. Specifically, she would conduct patient rounds with a psychiatric nurse or a social worker and speak to floor nurses and certified nurse's assistants who were working with the patients. Dr. Dees would take notes regarding her visits and her analyses on the patients' charts. Instead of using the paper charts utilized at St. Agnes, Legacy used a software called Point Click Care for its patient charts. Dr. Dees would log her notes, including ICD-9 or ICD-10 codes, on the psychiatry tab of the patient's Point Click Care page. Dr. Dees would also check the PHQ-9 tab on the patient's Point Click Care page to ensure that the patient's score was consistent with her medical diagnosis.

50. In October 2015, Dr. Dees was documenting her clinical notes, exams and findings electronically using Point Click Care in the social worker office on the first floor of the building. Warren Barr South Loop's head social worker, Libby Reinecke, another Warren Barr South Loop social worker, and three social worker students were in the office at the time. While reviewing her patients' PHQ-9 scores, Dr. Dees noticed that several had been given high PHQ-9 total scores, indicating moderate or severe depression. These

PHQ-9 scores were not consistent with these patients' medical diagnoses, what Dr. Dees had observed on her previous visit, or the patients' prior PHQ-9 scores.

51.     Dr. Dees immediately told Ms. Reinecke that the PHQ-9 scores from the patients they had seen that day were too high.  Dr. Dees explained to the group that the high PHQ-9 scores indicate that the patients had moderate or severe depression despite the fact that they had not been diagnosed with moderate or severe depression that day or previously, and were not being treated as such.  She asked the group of social workers and students, "Am I missing something?"  Ms. Reinecke told Dr. Dees that she was not misunderstanding anything, but that they had been told by Legacy to raise the PHQ-9 scores for these patients because the PHQ-9 scores were an "assessment of risk."  Dr. Dees responded that using PHQ-9 scores as a risk assessment was "not the correct use of the PHQ-9 assessment."  The conversation ended and Dr. Dees finished filling out her charts before she left for the day.  Dr. Dees had similar conversations regarding Warren Barr South Loop patients' PHQ-9 scores many times over the following months with Warren Barr South Loop staff members.

52.     One patient that stood out to Dr. Dees in particular was Wanda Chiu. Dr. Dees had been evaluating Ms. Chiu since October 1, 2014, soon after Legacy took over management of Warren Barr South Loop.  Ms. Chiu, who has Down syndrome, spent her days watching television, and was generally a very happy person.  Dr. Dees had never diagnosed Ms. Chiu with depression or even noticed any depression symptoms.  Her PHQ-9 score had always been 0.  However, after visiting Ms. Chiu in October 2015, Dr. Dees noticed that Ms. Chiu's most recent PHQ-9 score was a 10, indicating moderate depression. Dr. Dees had evaluated Ms. Chiu that same day and she had been her consistently happy self,

with no signs of depression. According to Dr. Dees' professional experience, Ms. Chiu should have had a PHQ-9 score of 0 and there was no explainable reason why she should have a score of 10. Dr. Dees was so concerned about the inaccuracy of the PHQ-9 score for Ms. Chiu, that she discussed it with a social worker, "Lucille," who had developed a close relationship with Ms. Chiu, and with the social service director, Ms. Reinecke. Lucille told Dr. Dees that Ms. Chiu had never appeared depressed to her.

C.     **Dr. Dees' Complaints to Legacy Employees**

53.     In the weeks and months that followed Dr. Dees' first discovery of Legacy's fraudulent scheme in October 2015, Dr. Dees and her nurse practitioner student Yulyia Iglitskaja continued to notice that the PHQ-9 scores of patients at Warren Barr South Loop were all high (i.e., scores of 10 or higher) and those scores did not match the patients' medical diagnoses or medications. Both Dr. Dees and Ms. Iglitskaja had multiple conversations with Warren Barr South Loop employees about the discrepancy for months before they decided to stop working at Warren Barr South Loop. Most of these conversations took place in the social worker office while Dr. Dees and Ms. Iglitskaja were entering their clinical notes, exams, and findings electronically on Point Click Care. There were usually multiple Warren Barr South Loop employees present for these discussions.

54.     On one occasion, after observing many PHQ-9 scores that did not match their observations or the patients' prior scores, Dr. Dees and Ms. Iglitskaja made a list of all the patients that they believed needed to have their PHQ-9 scores lowered because they were not consistent with the patients' actual depression levels. Dr. Dees and Ms. Iglitskaja gave the list to Ms. Reinecke and another Warren Barr South Loop social worker. Ms.

Reinecke's students were also present. Dr. Dees and Ms. Iglitskaja informed the group that the PHQ-9 scores for these patients were not consistent with the patient's mood and needed to be lowered to be accurate. Ms. Reinecke took the list, without comment. Dr. Dees and Ms. Iglitskaja checked these same patients' charts on multiple occasions after providing the list to Ms. Reinecke to see if the PHQ-9 scores had been revised, but they never were. When Dr. Dees inquired about the list, Ms. Reinecke informed her that the PHQ-9 score "was an assessment of risk" and did not indicate how the patient was actually feeling. Ms. Reinecke would repeat this statement to Dr. Dees and Ms. Iglitskaja on multiple occasions thereafter.

55. On another occasion, as Dr. Dees complained about the inflated PHQ-9 scores to Ms. Reinecke, Dr. Dees became so frustrated that she printed out a copy of the PHQ-9 test and demonstrated to Ms. Reinecke how the test was supposed to be performed. This interaction did not result in any revision to patients' PHQ-9 scores.

56. On a third occasion, Dr. Dees and Ms. Iglitskaja questioned Ms. Reinecke and a Warren Barr South Loop social worker named Lucille about Ms. Chiu specifically. Lucille, who had also worked at St. Agnes before it was purchased by Legacy and renamed Warren Barr South Loop, agreed that Ms. Chiu had never been depressed and could not explain why Ms. Chiu had a PHQ-9 score of 10, which signals moderate depression. However, when Dr. Dees then asked Lucille to correct the score, she refused.

57. Along with complaining about the inflated PHQ-9 scores to the social workers at Warren Barr South Loop, Dr. Dees also had frequent conversations about the scores with Marivic Mercado, a psychiatric nurse, and Josephine Auza, the Director of Nurses. Dr. Dees and Ms. Iglitskaja conducted rounds three or four times a month with Ms. Mercado and Ms. Auza. Both Ms. Mercado and Ms. Auza had previously worked at other

Warren Barr locations before being transferred to Warren Barr South Loop. While Dr. Dees and Ms. Iglitskaja were performing rounds with Ms. Mercado and/or Ms. Auza, Dr. Dees would complain to them that the PHQ-9 scores were too high and did not reflect the patients' actual depression levels. Initially, both Ms. Mercado and Ms. Auza agreed that the scores were too high. Although they did not seem surprised by the discovery, Ms. Mercado and Ms. Auza told Dr. Dees that they had reported the issue to "corporate" and that "corporate" would be following up with them. Approximately 4-6 weeks after Ms. Mercado and Ms. Auza had told Dr. Dees that they had reported the issue to Legacy, Ms. Mercado and Ms. Auza told Dr. Dees that "corporate" had gotten back to them and had told them that they were not going to change any of the PHQ-9 scores. They explained that "corporate" had told them the PHQ-9 score was a "risk assessment" and, therefore, the scores were accurate. Dr. Dees responded that this was fraud, but Ms. Mercado and Ms. Auza did not comment further.

58.     After some time, Dr. Dees and Ms. Iglitskaja realized that they would be unable to convince Legacy, or the social workers at Warren Barr South Loop, to record accurate PHQ-9 scores going forward, or to fix the old, upcoded PHQ-9 scores. Thus, they began documenting the discrepancy on some of the patient's medical charts. On the charts of the patients whom they believed their PHQ-9 scores were egregiously upcoded (but not on all of the charts that they believed to be falsified), Dr. Dees and Ms. Iglitskaja would note that the PHQ-9 score was not consistent with the medical diagnosis. Dr. Dees took this step not only because she was frustrated with the social workers' and Legacy's unwillingness to correct the upcoding, but also because she was concerned that the inconsistencies in the patients' records could be used to undermine or discredit her medical diagnoses and treatment.

59.     Around February or March of 2016, months after Dr. Dees first discovered the upcoded PHQ-9 scores and made repeated complaints about the issue to several Warren Barr South Loop employees, Dr. Dees was explaining her concern about the upcoded PHQ-9 scores to a colleague who also works in the nursing home industry. That colleague suggested to Dr. Dees that Legacy was likely increasing the PHQ-9 scores because by doing so, Legacy receives a higher reimbursement rate from the government, which she believed to be an additional $100 per day, per patient, if the patient had a higher PHQ-9 score.

60.     Soon after her conversation with her colleague, Dr. Dees decided to confront Ms. Mercado and Ms. Auza about the issue once again. Dr. Dees told Ms. Mercado and Ms. Auza that she knew they were recording and reporting high PHQ-9 scores because they received more money from the government if a patient has a high score. Because Dr. Dees was upset by Legacy's on-going fraud, she became very confrontational towards Ms. Mercado and Ms. Auza during this conversation. However, neither Ms. Mercado or Ms. Auza responded to her accusations or took any action in response to those acquisitions.

61.     Soon after confronting Ms. Mercado and Ms. Auza, Dr. Dees gave her 30-day notice that she would be leaving Warren Barr South Loop to Administrator Crystal Shelby. In the same conversation, Dr. Dees told Ms. Shelby about the PHQ-9 scheme. Dr. Dees told Ms. Shelby that she was upset that although she had reported the discrepancy to multiple people, it was never corrected. Ms. Shelby seemed genuinely shocked and surprised by this information. Ms. Shelby told Dr. Dees that, "there should not be fraud in our building" and was worried about the situation because, as she told Dr. Dees, "it's my license that's at risk, too." During Dr. Dees' last month at Warren Barr South Loop, April 2016, Ms.

Shelby continued to try to convince Dr. Dees to stay, but Dr. Dees refused. Dr. Dees however never gave up on reporting the PHQ-9 issue. Throughout April 2016, Dr. Dees continued to have conversations with Ms. Mercado about why Legacy refused to fix the inaccurate, upcoded PHQ-9 scores. But Ms. Mercado no longer responded to Dr. Dees' questions regarding the fraud. Dr. Dees' last day at Warren Barr South Loop was April 30, 2016.

62.     Although this disclosure is based upon Dr. Dees' personal observations and interactions with employees at Warren Barr South Loop, it is possible that Legacy engaged in these practices in other facilities. First, Ms. Mercado worked not only at Warren Barr South Loop, but also at Warren Barr Gold Coast. Second, Ms. Auza, the Director of Nurses at Warren Barr South Loop, had previously worked at another Legacy facility. Third, Ms. Mercado and Ms. Auza reported Dr. Dees' concerns to "corporate," and then later reported that "corporate" believed the PHQ-9 scores were accurate.

**D.     Legacy's Scheme Adversely Impacts Patient Care**

63.     Legacy's upcoding scheme adversely impacts patient care in a number of ways. First and foremost, Legacy's upcoding practices cost government medical insurers hundreds of thousands of dollars annually, preventing those programs from covering other, legitimate medical expenses. The upcoding scheme also stigmatizes the patient as being prone to depression because the assessment scores remain a part of the patient's medical record.

**E.     The Allegations Against Legacy Give Rise to False Claims Act   and IFCA Liability**

64.    Legacy's schemes give rise to liability under the False Claims Act and the IFCA.  Claims for reimbursement to Medicare and Medicaid for upcoded claims, services that do not qualify for reimbursement, and unnecessary patient visits are false.  *See, e.g., United States ex rel. Oughatiyan v. IPC the Hospitalist Company, Inc., et al.*, 2015 WL 718345, at *6 (N.D. Ill. 2015) (finding upcoding scheme stated a claim for FCA liability); *United States ex rel. White v. Gentiva Health Servs., Inc.*, No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223, at *14-15 (E.D. Tenn. June 25, 2014) (denying motion to dismiss relator's false qualification for Medicare scheme); *United States v. Janati*, No. 05-4255, 237 Fed. Appx. 823 (4th Cir. Aug. 1, 2007) (affirming convictions for upcoding); *United States ex rel. Sharp v. Eastern Oklahoma Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2009 WL 499375, *11-13 (N.D. Okla. Feb. 27, 2009) (denying motion to dismiss relator's upcoding claims). *See also* 42 U.S.C. § 1395y(a)(1)(A) (providing that Medicare covers only reasonable and necessary services); 42 U.S.C. § 1320c-5(a)(1) (acknowledging that providers have a duty to provide services only when they are medical necessary); 42 C.F.R. § 411.15(k) (Medicare regulations exempt from payment services that are not reasonable and necessary).

65.    Legacy upcoded the PHQ-9 scores of its patients for the purpose of receiving higher daily reimbursement rates from the government for those patients.  Legacy submitted those bills, with knowledge of their falsity, to Medicare and Medicaid – the government – for payment.

## COUNT I

### (Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a))

66.     Relator repeats and realleges each and every allegation contained above as though fully set forth herein.

67.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

68.     Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who –

> (1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government …

69.     On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

> (1)     any person who –
>
> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim …

70.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in

violation of 31 U.S.C. § 3729(a)(1) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(A), as amended on May 20, 2009.

71.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B), as amended on May 20, 2009.

72.     Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

73.     The United States Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

74.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT II

### (Violation of the Illinois False Claims Act, 740 ILCS 175/3)

75.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 64 of this Complaint as though fully set forth herein.

76.     This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1, et seq.

77.     740 ILCS 175/3(a) provides, in relevant part, liability for:

(1)  any person who –

    (A)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim …

78.  Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(1)(A), and continue to do so in violation that same statute.

79.  Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(1)(B), and continue to do so in violation that same statute.

80.  Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

81.  The State of Illinois, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

82.  By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## PRAYER

WHEREFORE, Plaintiff-Relator Dr. Michelle Dees, on behalf of the United States of America, demands that judgment be entered against Defendants Legacy Healthcare Financial Services, LLC, Legacy Healthcare Network, LLC, d/b/a Legacy Healthcare and South Loop Skilled Nursing Facility, LLC, d/b/a Warren Barr South Loop ordering that:

1. A permanent injunction requiring Defendants to cease and desist from violating the False Claims Act and the IFCA;

2. Pursuant to 31 U.S.C. § 3729(a) and 740 ILCS 175/3(a), Defendants pay an amount equal to three times the amount of damages the United States Government and State of Illinois have sustained as a result of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729(a) and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 740 ILCS 175/3;

3. Plaintiff-Relator be awarded her relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4;

4. Plaintiff-Relator be awarded all costs and expenses of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4; and

5. Plaintiff-Relator, the United States of America, and the State of Illinois be awarded such other and further relief as the Court deems just and proper.

## TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38, Plaintiff-Relator, Dr. Michelle Dees hereby demands a

jury trial on all issues so triable.


Dated:  April 28, 2017                            Respectfully submitted,

                                                  DR. MICHELLE DEES


                                                  By _____

                                                  William C. Meyers
                                                  Matthew K. Organ
                                                  W. Kyle Walther
                                                  GOLDBERG KOHN LTD.
                                                  55 East Monroe Street
                                                  Suite 3300
                                                  Chicago, Illinois  60603
                                                  (312) 201-4000

                                                  JS LAW
                                                  Jeffrey Sobek
                                                  29 E. Madison Street
                                                  Suite 1000
                                                  Chicago, Illinois 60602
                                                  (312) 756-1330
                                                  jeffs@jsslawoffices.com

                                                  *Counsel for Dr. Michelle Dees*